IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 4:20-cr-011 |
| | ) | |
| v. | ) | |
| | ) | |
| CODY RAY LEVEKE, | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

**INTRODUCTION**

On January 21, 2020, the government obtained an indictment charging Cody Ray Leveke with two counts of interstate communication of a threat, both on or about September 3, 2019, in violation of 18 U.S.C. § 875(c). Mr. Leveke elected to represent himself, and on September 29, 2020, was found guilty by a jury on both counts. Mr. Leveke later elected to have counsel represent him for the remainder of the case.

The presentence report drafter determined that Mr. Leveke's base offense level under the advisory sentencing guidelines is 12, pursuant to USSG §2A6.1(a)(1). (PSR ¶30). Over Mr. Leveke's objection, a two-level increase for the offense involving more than two threats was applied. (PSR ¶31). An additional six-level increase was applied under USSG §3A1.2(b), again over Mr. Leveke's objection. (PSR ¶32). After calculating his criminal history category as IV (PSR ¶46), the presentence report drafter found a total offense level of 20 and a total advisory sentencing guideline range of 51 to 63 months of imprisonment. (PSR ¶97). Mr. Leveke maintains his objection to the advisory guideline increase based on the claim that there are more than two threats involved in the case. He also maintains his objection that the six-level increase

under USSG §3A1.2(b), should not apply.  He further argues that he should receive a two-level reduction for acceptance of responsibility under USSG §3E1.1.  Additionally, he objects to imposition of the recommended conditions of supervised release that he be subject to polygraph testing and internet monitoring.  He also requests that the recommended condition prohibiting contact with the victim be amended to prohibit contact for any reason not related to his legislative duties.  Regardless of the Court's ruling on the advisory guideline questions in the case, the ultimate question is what sentence is "sufficient, but not greater than necessary" in this case, pursuant to the factors in 18 U.S.C. § 3553(a), and Mr. Leveke argues that a sentence below the advisory guideline range may be sufficient in this case.

## ARGUMENT

Before reaching the ultimate question of what sentence is "sufficient, but not greater than necessary" for Mr. Leveke under the factors of 18 U.S.C. § 3553(a), the Court is first required to correctly calculate the applicable advisory sentencing range under the United States Sentencing Guidelines. *See United States v. Smith*, 983 F.3d 1006, 1007 (8th Cir. 2020) (noting that it is procedural error to improperly calculate the guideline range, treat the guidelines as mandatory, fail to consider the § 3553(a) factors, select a sentence based on clearly erroneous facts, or fail to adequately explain the chosen sentence (citing *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009)).  Initially, Mr. Leveke objects to being assessed a two-level increase for the offense involving more than two threats.  Besides the two emails from September 3, 2019, the presentence report alleges that a September 4, 2019 email where Mr. Leveke considered the failure of the Iowa Legislature to change Iowa's prohibition on non-residents from applying for removal from the sex offender registry to be an "act of aggression" and stating that "[t]hose who seek to violate the Constitution will be held accountable and will answer to me," constitutes an

additional threatening communication. (PSR ¶13).  This email lacks the same rhetoric and tone and tenor of the emails charged in the indictment, both of which contained references to Mr. Leveke being "angry enough to pull a mass shooting down at the State House" (PSR ¶8), and suggesting the "legislature walk the line" because "[t]he continuing Disobedience to the Constitution by the legislature deserves a violent response at this point" and "THE 2ND AMENDMENT EXISTS SO WE CAN KILL POLITICIANS WHEN THEY DONT [sic] ACT IN ACCORDANCE TO LAW." (PSR ¶12).  The phrase in Mr. Leveke's September 4, 2019, email that one could potentially strain to consider a threat would be the statement that legislators who "seek to violate the Constitution will be held accountable and will answer to me. Understood?" (PSR ¶13).  But the statements in this email on their face could just as easily be those of an individual indicating he intends to pursue legal process, or start a petition, or call the newspapers, or vote against a legislator in the next election.

　　　　The only way this third email could possibly be construed as a threat is if it is considered in the context of the prior communications that the jury found do constitute threats.  However, the application note to guideline 2A6.1 suggests "the court should consider conduct that occurred prior to the offense and conduct that occurred during the offense" when determining the number of threats involved in the offense. USSG §2A6.1, n.1.  And "offense" is defined in USSG §1B1.1, n.1(I) as meaning "the offense of conviction and all relevant conduct," with relevant conduct being limited to the acts "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." USSG §1B1.3(a)(1)(A).  Both definitions are tethered to the offense of conviction, and omit any reference to acts that occurred after the offense of conviction (except for acts that occurred to attempt to avoid detection or responsibility for the offense of

conviction). The text of both these provisions therefore indicates that for guideline purposes, the offenses in this case ended after the September 3, 2019, charges on which Mr. Leveke was convicted. This reading makes the most sense, because otherwise *any* subsequent communication by Mr. Leveke could be construed as a threat, simply by carrying forward the context of the prior communications that have been found to be threats by the jury. A victim of a threat is likely to consider any subsequent communication to be a continuation of a threat, but the law requires more than that given the First Amendment concerns at stake in these kinds of cases.

In addition to the objection related to the number of threats, Mr. Leveke objects to being assessed the six-level official victim enhancement under USSG §3A1.2(b). Application of this enhancement is complicated by the fact that the actual intended "victim" in this case was really the Iowa Legislature as a whole, with Senator Herman Quirmbach being the member of that body who received the communications from Mr. Leveke. The application note to the guideline states that guideline 3A1.2 "does not apply when the only victim is an organization, agency, or the government." USSG §3A1.2, n.1. Mr. Leveke's communications found to be threats were directed to the Legislature as an overall whole, rather than intending to threaten Senator Quirmbach. He asked for the names of individuals in the Iowa House of Representatives that were holding up the proposed legislation, threatened a mass shooting at the State House, complained of the state of Iowa violating his rights, suggested the legislature walk the line and not violate anyone's rights, ordered the Iowa Legislature to stand down, and spoke of the second amendment existing so the people could kill politicians that do not act in accordance with the law. (PSR ¶¶8–12). The only language that is arguably, directly intended specifically for Senator Quirmbach is when Mr. Leveke closed his first email with the phrase: "STOP BREAKING THE LAW ASSHOLE!" (PSR ¶8). While Senator Quirmbach is the person who received the

threatening communications, and is in fact a member of the Legislature, the threats of harm were meant to be conveyed to the Legislature as a whole.[1]  As the trial testimony showed, Senator Quirmbach had been assisting Mr. Leveke in efforts to change Iowa law to allow non-residents to petition for removal from the sex offender registry.  It makes little sense for Mr. Leveke to intend to threaten him personally, or for any threat to be motivated by Senator Quirmbach's individual status as a state senator, given that the Iowa Senate had actually passed the bill and it was the House that declined to take the matter up for a vote.  Under these convoluted circumstances, the official victim enhancement should not apply at all under the strict language of the guideline and the application notes. *See*, *e.g.*, *United States v. Schroeder*, 902 F.2d 1469, 1471 (10th Cir. 1990) (holding that in order to find an official victim enhancement, the victim must be the one who is the object of the threat, and declining to accept the government's argument that the receiver of a threat should be deemed a victim regardless of whether the receiver was the target of the threat).  Nevertheless, if the Court believes that some adjustment is appropriate under the facts of this case, Mr. Leveke maintains that a three-level offense level adjustment may be more appropriate.[2]

Finally, in the context of the advisory guideline calculation, Mr. Leveke argues that he should receive a two-level reduction for acceptance of responsibility under USSG §3E1.1(a). Mr. Leveke's defense to the charges was that his communications were political hyperbole that did not constitute true threats as a matter of law.  He raised that argument in his pro se pretrial

---

[1] The evidence at trial demonstrated that the message was viewed as a threat to the entirety of the legislature, in that it was referred to Capitol security officials and treated as a threat to the entire body.

[2] The Court could effectuate a three-level adjustment, or any other degree of adjustment, to the guideline through a departure, or simply account for it as part of the § 3553(a) analysis in the case, depending how it rules on the advisory guideline calculation issues.

filings in the case, and argued it to the jury at trial. At no point did he ever dispute any of the factual allegations raised or presented against him, and never denied sending the communications at any point in the case. He only denied that what he said constituted threats. His appeal of his conviction will focus on the same legal question. He could not bring himself to plead guilty to the charge, because it would require him to admit he intended the communication to be a threat, or knew it would be viewed as one, and he does not believe his communications are true threats, given his reading of the law, as he has expressed in his pro se pleadings throughout the case. Given the nature of Mr. Leveke's defense at trial, this is the "rare situation[]" contemplated by the application note, where an adjustment for acceptance of responsibility makes sense and should be applied. USSG §3E1.1, n.2.

Of course, ultimately the question is what sentence is "sufficient, but not greater than necessary" for Mr. Leveke under the statutory sentencing factors of 18 U.S.C. § 3553(a). Though the communications found to be threats in this case caused concern to Senator Quirmbach and security staff at the Iowa Capitol, and ramped up the alertness level, Mr. Leveke was residing across the country in Arizona when he made them. He had not resided in Iowa since 2009, and was living in Arizona when he contacted people in Iowa. (PSR ¶61). He was homeless and living in his car in California when he was arrested in this case on October 22, 2019. *Id*. There is no indication he had any actual ability to carry out any sort of act against the Iowa Legislature. At the time he sent the communications, he was a month into release from a three-month prison term for harassment via text message to employees of his former company, was using a significant amount of marijuana on a daily basis, lacked any support system, and was almost certainly being affected by the anxiety and depression problems he has battled throughout his life. (PSR ¶¶43, 65, 68, 73). Mr. Leveke was probably at one of the lowest moments of his

adult life when he sent the communications to Senator Quirmbach, and his frustration, and unstable personal and mental health situation exacerbated by his marijuana use, likely factored into his offense behavior.

Indeed, there can be no doubt that Mr. Leveke has led a challenging life.  He grew up witnessing domestic violence between his parents. (PSR ¶51).  His father sexually abused both he and an older sister throughout their childhood. *Id*.  His mother was also physically and verbally abusive toward him. *Id*.  His father was involved with distributing marijuana, and eventually created a "church" in an unsuccessful effort to create a religious freedom defense to protect himself from legal liability. *See United States v. Meyers*, 95 F.3d 1475, 1480–81 (10th Cir. 1996) (declining to overturn Meyers' conviction under free exercise grounds, based on *Employment Division v. Smith*, 494 U.S. 872 (1990)).  He lived with his mother after his parents divorced, and they were briefly homeless until she obtained permanent housing for herself and the children. (PSR ¶52).  From the outset, his life has not been easy.

The ramifications of the childhood sexual abuse of Mr. Leveke and his siblings likely played in a role in his 2001 Iowa conviction for incest, which occurred when he was a teenager, and involved his younger sister. (PSR ¶¶41,58).  Mr. Leveke was originally charged in a criminal complaint with 3rd degree sex abuse for this offense, and as has been noted at trial and throughout his pro se pleadings, the 3rd degree sex abuse notation is listed in law enforcement databases and has caused him to have problems when officers have mistakenly believed he was convicted of that offense and subject to sex offender registration requirements in Arizona.  His deferred judgment on that case was revoked in 2006, and he completed sex offender treatment programming while incarcerated for it. (PSR ¶¶41, 71).  It was after this offense that Mr. Leveke first sought and received some mental health care.  He then was diagnosed with depression and

anxiety. (PSR ¶65). He has continued to struggle with mental health problems throughout his life, including hospitalizing himself for a suicidal ideation in 2005 in Iowa Falls, Iowa, seeking treatment in Mesa, Arizona in 2018 after feeling like he was a danger to himself, and having had thoughts of self-harm and harming others during his time in detention during this case. (PSR ¶¶66–68, 70). He has also had major problems with gambling in recent years that contributed to him becoming homeless. (PSR ¶72). He believes mental health treatment does work, has pursued it on his own volition in the past, is interested in future mental health care, and has been on medications in the past. (PSR ¶70).

After losing his deferred judgment and serving a revocation sentence on the incest conviction, Mr. Leveke went a decade before he had further legal problems. He completed his diploma through DMACC, and later obtained a bachelor's degree in mechanical engineering from Iowa State University in 2009. (PSR ¶¶79–80). Since moving to Arizona, he has worked in the HVAC industry over the past decade. (PSR ¶¶83–87). But he started using marijuana at age 31, and by age 34 his habit had become daily and constant. (PSR ¶73). He believes he was using marijuana as a means of self-medicating his anxiety and depression, and that it "made [him] crazy and made [him] lose everything," because it amplified his mental health problems when he was unstable. *Id*. Recognizing the link between his drug use, his mental health struggles, and the negative impacts on his life, Mr. Leveke also welcomes future substance abuse treatment, which he has never had before. (PSR ¶76). Notably, it is after his marijuana use became a constant that he began having problems with the law, starting with a 2018 disorderly conduct offense, followed by the aforementioned 2019 harassment offense, both of which involved problems interacting with co-workers that have some degree of parallel to the nature of the charges in the instant case. (PSR ¶¶42–43).

Clearly, Mr. Leveke had a traumatic childhood, and that contributed to him getting into legal trouble at a young age.  But he then did very well for himself in society for a long time, before his mental health problems were compounded with a substance abuse problem, and his life derailed.  His past sex offense, and the references to it in law enforcement and databases and online that have resulted in social stigma and mistaken beliefs about his registration duties, appear to have become a fixation to some degree for him over the past few years, leading to him pursuing legal action to get himself off the registry in Iowa.  What is a laudable goal of getting the Iowa Legislature to change the law so others can follow in his footsteps without needing to pursue litigation to get access to the Iowa courts to do so, somehow became an acute frustration when his efforts were delayed by legislative morass, with the degree of that frustration being magnified by the state of his life and his mental condition in September of 2019.  All of which culminated with the emails that form the basis for the charges on which he was convicted by the jury.

However, a close look at Mr. Leveke's individual history and characteristics alongside these underlying circumstances of his offense behavior shows that he needs some help to get back to the life he had between 2008 and 2018.  This would entail sorting out his current mental health condition, and overcoming his addiction to marijuana and the impulse to self-medicate.  He has highly marketable skills, and has found work almost consistently over the past decade.  With some help to achieve the sort of stability he looks to have had in the past, he is not likely to pose any particular future danger to the community.  While this offense is serious under the law, his criminal history is limited and recent, which again suggests that the deterioration of his mental health — magnified by his substance abuse problem — is likely the major contributing factor.  To that end, Mr. Leveke does not need a lengthy term of imprisonment to deter him from

future criminal conduct. The term of supervised release, along with substance abuse and mental health evaluation and treatment, will do more to provide him with needed correctional and rehabilitative treatment than will a lengthy prison term.

Relatedly, Mr. Leveke maintains his objection to the recommended condition of supervised release that he be subjected to polygraph testing and sex-offense assessments to determine a need for sex offender treatment. The offenses of conviction in this case are not sex offenses. There is no sexual element to them. Mr. Leveke's sex offense occurred nearly two decades ago, he completed sex offender treatment related to that offense, and there is no indication of subsequent illegal sexual behavior by Mr. Leveke in the decades since. A special condition of supervision must be "reasonably related" to the nature and circumstances of the current offense, a defendant's individual history and characteristics, the need to protect the public from further crimes by the defendant, the defendant's correctional needs, and involve "no deprivation of liberty than is reasonably necessary" to effectuate those criteria. 18 U.S.C. § 3583(d). The Probation Office should not be permitted to use an invasive and investigatory condition in order to decide whether sex offender treatment is necessary. To say otherwise would justify the use of polygraphs to make any sort of treatment and supervision assessment for a person on supervised release. There needs to be more than a nearly twenty-year old sex offense for which a defendant completed his treatment obligation for the recommended condition to be "reasonably related" to the statutory criteria, and an exploratory expedition via polygraph examination is a greater deprivation of liberty than necessary to meet the statutory goals under these facts.

Similarly, while this offense involved the use of the internet to send the emails, the recommended condition prohibiting Mr. Leveke from possessing internet capable devices

without approval of the Probation Office is overbroad and insufficiently tailored to the circumstances of his offense. This is not a case where a defendant used the internet to access unlawful content that is unprotected by the First Amendment. The internet was merely the means of sending the communications that the jury found to be threatening.[3] What the Probation Office seeks is authority akin to being able to open a defendant's mail to review the contents of his letters, both sent and received, whenever it wishes. There is nothing reasonable about this degree of invasion of Mr. Leveke's First Amendment and privacy rights, and this condition would permit the invasion of the rights and privacy of any persons with whom Mr. Leveke may be communicating.[4]

Returning to the question of what punitive sanction is "sufficient, but not greater than necessary" under the 18 U.S.C. § 3553(a) factors, the Court should also consider that nature of Mr. Leveke's detention. He has been incarcerated since November of 2019, and was prepared to quickly proceed to trial at its first scheduled setting, only to have the COVID-19 pandemic cause significant delay in the ability to provide him with his speedy trial right, and culminating with the Court electing to move the trial to the eastern division of the district in September of 2020, to avoid further delay in the case. During that time, Mr. Leveke has primarily been in solitary confinement in the protective custody areas of the jails in which he has been confined. It does not appear that he has received any significant mental health care, and the facilities had to adjust

---

[3] The news articles about the mass shooting, and how a prohibited person obtained a firearm, along with the video clip from the incest genre of a pornographic website, are all legal materials protected by the First Amendment accessible to anyone, and provide no justification to grant the Probation Office the ability to monitor everything Mr. Leveke views online.

[4] In regard to the recommended condition prohibiting Mr. Leveke from contacting Senator Quirmbach or his family in the future without the permission of the Probation Office, Mr. Leveke asserts that this condition should be narrowed to prevent any contact with Senator Quirmbach that is not related to his duties as state senator, or something to that affect.

to dealing with a pro se litigant in the midst of adapting to a global pandemic, which caused him further consternation, as reflected in his pro se pretrial filings in the case. These circumstances undoubtedly caused a negative impact on his mental health situation, and likely played some role in the administrative infractions he has accrued during his time in custody. Nothing about Mr. Leveke's time in custody has been easy or simple, and that will likely remain the case in the Bureau of Prisons until vaccines for the virus become widely available and an effective distribution mechanism put in place. In the meantime, conditions of confinement continue to pose risks of contracting the virus, and remain more punitive than they were before the pandemic, with the ability to receive correctional and rehabilitative treatment within the Bureau of Prisons continuing to be nearly non-existent. *See* Joseph A. Bick, *Infection Control in Jails and Prisons*, Clinical Infectious Diseases 45(8): 1047-1055 (2007), (January 21, 2021, 3:04 PM), https://doi.org/10.1086/521910 (noting that jails, prisons, and other detention types of facilities are optimal environments for the spread of contagions); *see also United States v. Davidson*, 2020 WL 4877255 at *22 (W.D. Pa. August 20, 2020) (noting that a prison sentence becomes "significantly more laborious and difficult" if an inmate is subjected to quarantine procedures or contracts the virus).

      The overarching question at this stage of proceedings is what sentence is "sufficient, but not greater than necessary," given the nature and circumstances of this offense, Mr. Leveke's personal history and characteristics, and the remaining factors of 18 U.S.C. § 3553(a). Mr. Leveke understands that the jury has found him guilty of making threats, and that he faces a sanction for his crimes. Prison, however, is purely punitive, and is not tied to providing the correctional and rehabilitative treatment, particularly in the forms that Mr. Leveke needs or in the manner that will be most effective for him. *See* 18 U.S.C. § 3582(a) (stating that "imprisonment

12

is not an appropriate means of promoting correction and rehabilitation"). This is even more so the truth at this moment in time, when the response to the COVID-19 viral pandemic has only increased the punitive nature of incarceration, and has done so at the expense of access to correctional and rehabilitative care. As noted above, Mr. Leveke does have some insight into the problems that have led him to this point in his life, and is motivated to pursue correctional and rehabilitative care to better his future.

The Court has a wide variety of sentencing options available to impose a sentence that balances punishment and rehabilitation for Mr. Leveke. However, a sentence at or above 51 months, as is recommended by the presentence report, is greater than necessary to achieve the statutory sentencing goals of 18 U.S.C. § 3553(a) in this case, and a lesser prison sentence would be sufficient punishment. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (stating that 18 U.S.C. § 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing."); *accord Holguin-Hernandez v. United States*, 140 S. Ct. 762, 766 (2020) (emphasizing that the law instructs sentencing courts to impose sentences that are not greater than necessary to comply with the goals of 18 U.S.C. § 3553(a)). This has been an unusual case, and Mr. Leveke the atypical federal defendant, but the factors discussed above reveal the complexities of both this case and Mr. Leveke's individual history and characteristics that bear on the question of what a sufficient sentence is for him. *See Koon v. United States*, 518 U.S. 81, 113 (1996) ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").

Respectfully Submitted,

*/s/ Joseph D. Herrold*
Joseph D. Herrold
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER'S OFFICE
400 Locust Street, Suite 340
Des Moines, Iowa 50309-2353
PHONE: (515) 309-9610
FAX: (515) 309-9625
E-MAIL: joe_herrold@fd.org
ATTORNEY FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2021, I electronically filed this document with the Clerk of Court using the ECF system, which will serve it on the appropriate parties.

*/s/ Morgan Conn*, Paralegal